**TRINITY RIVER AUTHORITY OF TEXAS et al., Appellants,**

v.

**TEXAS WATER RIGHTS COMMISSION et al., Appellees.**

No. 11916.

Court of Civil Appeals of Texas, Austin.

May 17, 1972.

Rehearing Denied June 7, 1972.

Frank R. Booth, Clark, Thomas, Harris, Denius & Winters, Martin Harris, Mary Joe Carroll, Austin, Vinson, Elkins, Searls

& Smith, Victor W. Bouldin, Clifford W. Youngblood, Houston, for appellants.

Timothy L. Brown and L. Lamar Tims for Texas Water Rights Comm.

Crawford Martin, Atty. Gen., Nola White, First Asst. Atty. Gen., Samuel D. McDaniel, Staff Legal Asst. Atty. Gen., Roger B. Tyler, Asst. Atty. Gen., McGinnis, Lochridge & Kilgore, Joe M. Kilgore, James W. Wilson, Austin, McCall & McCall, Hamshire, Small, Herring, Craig & Werkenthin, Charles F. Herring, Fred B. Werkenthin, Lawrence S. Smith, Austin, for appellees.

O'QUINN, Justice.

This controversy began in February of 1970 with the filing of an application with the Texas Water Rights Commission by J. T. White and more than one hundred other rice farmers in Chambers, Liberty, and Jefferson Counties, whose farm lands are watered by the Devers canal system operated by the Trinity River Authority, requesting the Commission to fix reasonable rates for furnishing water for the crop years of 1970 and thereafter.

After hearing, the Commission, in July of 1971, denied relief to the petitioning rice farmers for the crop years 1970 and 1971, finding that a flat rate of $30.50 for those years, set previously by the Trinity River Authority, was not excessive, but the Commission did find that the rate was unreasonable because it induced wastage of water.

From this order appeal to the district court of Travis County was taken by both the petitioning rice farmers and the Trinity River Authority. The two causes were consolidated by the trial court. The court also ordered joinder of the holders of the "Devers Canal System Revenue Bonds, Series 1969," as parties defendant.

White and the other petitioning rice farmers sought a temporary injunction in district court relieving the farmers from liens on their crops upon payment of water charges based on 1968 rates and upon tender into court of the difference between the 1968 water rates and the rates for 1970 and 1971, which were higher than the rates in effect in 1968.

The trial court found that White and the other rice farmers had established a probable right to recover on the merits and that unless temporary relief were granted " . . . Trinity River Authority will in all likelihood have no funds available with which to pay any recovery which may eventually be awarded to J. T. White et al. in this appeal with respect to the 1970 and 1971 crop years."

The trial court, pending final hearing, enjoined Trinity River Authority from collecting from the farmers more than $29.40 per acre for irrigation on the main canal of the Devers system or more than $31.40 per acre from farmers on the Raywood branch of the system. This order was conditioned that the farmers tender into the registry of the court $1.10 per acre, being the difference per acre between the 1971 rates and the limits of collection allowed by the court. The court directed that payments of the difference of $1.10 be made through the Trinity River Authority into the registry of the court.

The figure of $1.10 per acre for all acreage irrigated in 1971 is the stipulated amount of Trinity River Authority's revenues from the Devers system remaining after allowing for payment of operating expenses and for interest on the authority's bonded indebtedness.

The bondholders are E. V. Boyt, C. K. Boyt, Ila B. Maxwell and Leila B. Jeffrey, who were owners of the Devers irrigation system prior to its purchase from them by the Trinity River Authority in December of 1969. Revenue bonds, in the face amount of $4,500,000, bearing interest at 4 percent, constituted the principal part of the purchase price.

The Trinity River Authority and the bondholders have appealed from the judg-

ment of the trial court under which the temporary injunction issued. The Texas Water Rights Commission and J. T. White and associated rice farmers are appellees. All parties have filed briefs.

The principal issues are (1) whether the Texas Water Rights Commission has jurisdiction to fix rates charged by the Trinity River Authority on its Devers system and (2) whether the district court correctly granted temporary relief pending trial on the merits.

We will affirm the action of the district court in overruling contentions below that the Texas Water Rights Commission was without jurisdiction to fix rates on the Devers system and that the trial court was without jurisdiction of an appeal from the order of the Commission. We will also affirm the action of the district court in granting temporary relief.

■ The Trinity River Authority and the bondholders contend that the Legislature, in creating the Authority in 1955, and by amendatory statutes in 1969, removed the Authority and its customers from the rate making jurisdiction of the Commission. The Trinity River Authority was created under the provisions of an Act of the Legislature now compiled as Article 8280–188, Vernon's Annotated Texas Statutes. (Acts 1955, 54th Leg., ch. 518, p. 1314)

Section 5 of the Act states that "The Authority is hereby invested with all of the powers of the State under Article XVI, Section 59 of the Constitution to effectuate flood control and the conservation and use, for all beneficial purposes, of storm and flood waters and unappropriated flow waters in the Trinity [River] watershed, *subject only to*: (i) declarations of policy by the Legislature as to use of water; (ii) *continuing supervision and control by the State Board of Water Engineers and any board or agency which may thereafter succeed to its duties* [now the Texas Water Rights Commission]; (iii) the provisions of Article 7471 prescribing the priorities of

uses for water, and (iv) the rights heretofore or hereafter legally acquired in water by muncipalities and other users." (Emphasis added)

Section 24 of the Act of 1955 provides:

"The Authority is authorized and required to acquire water appropration permits directly from the Board of Water Engineers of the State of Texas [now the Texas Water Rights Commission] and may purchase permits from owners thereof. The Authority is also authorized to purchase water, or a water supply, from any person, firm, corporation or public agency, or from the United States or its agencies. *Nothing in this Act shall impair the authority granted to the State Board of Water Engineers* [now the Commission] *under the general laws of Texas to prescribe rates governing the sale of surface water by or to the Authority.*" (Emphasis added)

In 1969 the Legislature amended the Trinity River Authority Act to provide that "the Authority is hereby specifically empowered to acquire, operate, maintain, and improve the canal system and properties generally known as 'Devers Canal System' . . ." (Section 5(m) of Art. 8280–188, V.A.T.S.; Acts 1969, 61st Leg., ch. 364, p. 1118) In Section 5(n), the Legislature limited the bonds to be used for purchase of the Devers system to revenue bonds by providing that "in no event shall the Authority be authorized to assess, levy, or collect any tax of any nature whatsoever . . ."

The same Legislature, in 1969, further amended the 1955 Act in Section 8(a), which prescribes the three classes of bonds the Authority is permitted to issue, and in Section 8(g), pertaining to payment of revenue bonds. Only bonds "secured solely by a pledge of all or part of the revenues accruing to the Authority" are involved in this lawsuit. (Acts 1969, 61st Leg., ch. 156, 488; Secs. 8(a)(2) and 8(g), Art. 8280–188, V.A.T.S.)

Comparison of Sections 8(a) and 8(g), as amended, with the language of these sections as found in the Act of 1955 creating the Authority discloses no significant change in the original language authorizing revenue bonds and making it the duty of the Trinity River Authority to fix rates, tolls, and charges for sales and services sufficient to pay expenses and retire its revenue bonds. We find nothing in the two amendatory Acts of 1969 indicating the Legislature's intent to alter the status of the Authority under the 1955 Act, by which its powers were made subject to " . . . continuing supervision and control . . . " of the Commission (Sec. 5), or to alter provisions expressly preserving authority of the Commission " . . . to prescribe rates governing the sale of surface water by or to the Authority." (Sec. 24)

Section 8(g), as it appeared in the Act of 1955 and as it reads after amendment in 1969, provides that when bonds are payable wholly from net revenues, it is the duty of the board of directors of the Authority " . . . to fix, and from time to time to revise the rates, tolls, and charges for the sales and services rendered by the Authority . . . to the end that such rates, tolls, and charges, will yield sufficient money to pay: the expense of operating and maintaining the facilities . . . the principal of and interest on said bonds . . . and to create, and maintain the reserve funds and other funds as prescribed in the resolution authorizing, or the trust indenture securing, the bonds."

When the Authority was created in 1955 it was made subject, in the exercise of its powers, to the continuing supervision and control of the Commission under provisions of Section 5 of the Act and was expressly made subject to rate regulation by the Commission under Section 24. The rate making authority of the Commission began with its predecessor agency, the State Board of Water Engineers, in 1913 with enactment of Articles 7560, 7561, and 7562, Revised Civil Statutes of 1925, (Acts 1913, 33rd Leg., p. 358, ch. 171, secs. 60, 61, 62) brought forward as Section 5.041 of the Texas Water Code (Acts 1971, 62nd Leg., ch. 58), effective August 30, 1971, V.T.C.A. The rate making jurisdiction was expanded in 1918 when the antecedent statute of Article 7563 was enacted to cover furnishing water for any purpose mentioned in the irrigation Act of 1917. (Acts 1918, 35th Leg., 4th C.S., p. 129, ch. 55) As brought forward in the Texas Water Code (Sec. 6.056) the statute empowers the Commission to " . . . fix reasonable rates for the furnishing of water for any purpose mentioned in Chapter 5 or 6 of this code."

We consider it clear from Article 7560 that it is only after the proprietor of an irrigation system has set water rates that the customer may present a petition to the Commission invoking its jurisdiction. The statute provides: "If any person entitled to receive or use water from any canal, ditch . . . reservoir or lake . . . or stored supply, shall present to the board [Commission] his petition in writing, showing that the person, association of persons, corporation, water improvement or irrigation district, owning or controlling such water, has a supply of water not contracted to others and available for his use, and fails or refuses to supply such water to him, or *that the price or rental demanded therefor is not reasonable and just, or is discriminatory*; or that the complainant is entitled to receive or use such water, and is *willing and able to pay a just and reasonable price therefor* . . . it shall be the duty of the Board [Commission] to . . . [investigate] and determine whether there is probable ground therefor . . . ." (Emphasis added)

We agree with appellees that " . . . the Legislature . . . established in Arts. 7560–7563 a regulatory scheme in which two rate setting bodies . . . have serial jurisdiction." After the proprietor of an irrigation system has set rates it deems appropriate, a customer of the sys-

tem objecting to the rates may appeal to the Texas Water Rights Commission petitioning for rates the Commission shall find reasonable and just to all concerned. We find nothing in the Act of 1955 creating the Trinity River Authority (Art. 8280–188), or in the amendatory Acts of 1969, in conflict with, or inconsistent with, this regulatory scheme for the fixing of water rates.

The Legislature, as already noted, expressly preserved the plan in Section 24 of Article 8280–188 in this language: "Nothing in this Act shall impair the authority granted to the State Board of Water Engineers [the Commission] under the general laws of Texas to prescribe rates governing the sale of surface water by or to the Authority [Trinity River Authority]."

▇ We hold that after the board of directors of the Authority fixed rates the board deemed appropriate, its customers, J. T. White and associated rice farmers, were entitled to petition the Commission for review of the rates and for the fixing of rates which would be reasonable and just. The Commission had jurisdiction of the matter thus brought before it, and the district court had jurisdiction of the appeals from the order of the Commission.

In considering the second main issue in this case, relating to grant of temporary relief by the trial court, additional facts will be stated.

The Devers canal system as now operated by the Authority consists of about seventy-five miles of main canals and many more miles of laterals. The water intake point is near the community of Moss Bluff, about seven miles south of Liberty, and the system runs generally southeast to the intracoastal waterway at High Island on Bolivar Peninsula.

The system was privately owned and operated as the Devers Canal Company by the Boyt family of Devers, Texas, for more than forty years prior to 1970. During the last ten years of that period the company was pumping more than 120,000 acre feet of water annually to irrigate 25,000 to 30,000 acres of land. In this period a structured rate for water was in effect so that different charges were made for different irrigation water services. In 1968 the average charge per acre was $19.-46 based on the structured rate. Under the rate, the sum of all charges which could be made was $22.50 for most of the system, but the average was lower because not all farmers needed or were able to use all water services offered by the company.

The Trinity River Authority and the Boyts began negotiations in 1968 for purchase by the Authority of the Devers system. Since the Authority was without funds to buy the system, negotiations from the outset were conducted on the basis of paying for the system in bonds to be paid from revenues of the system. Representatives of the Authority appear to have considered the system, in terms of replacement cost new less an adjustment for depreciation, to be worth about $2,600,000. The Authority was aware that at the 1968 water rates the Authority could afford to offer the Boyt family bonds in the total face amount of between $2,600,000 and $2,750,000. The Boyts felt the system was worth between $6,000,000 and $7,000,000.

It was known to the Authority that the 1968 water rates would not support more than approximately $2,700,000 in revenue bonds, even on the assumption that the system would water 35,000 acres of land. A tentative agreement was reached, and finally put into effect, under which the Authority offered $4,500,000 in bonds plus the liquid assets of the company amounting to about $500,000. As part of the trade, the Boyts agreed to raise the water rates $4 per acre in 1969, the last year of their private operation of the system.

In the course of negotiations, the Boyts further agreed to pay the Authority $4.40 per acre foot for all water appropriated in excess of 86,000 acre feet under a 1959 contract purporting to establish the fixed rights of the Devers Canal Company. It is

undisputed that this payment would not have been required by the Authority but for the agreement of the Boyts to sell the system to the Authority. This water charge betwen the Authority and the Devers company was discussed by the parties as a justification to the rice farmers for the rate increase in 1969 and was required to be paid before the Authority entered into an option agreement with the Boyts.

Purchase of the system was completed in December of 1969. In January, 1970, the Authority announced its increase of the structured rate which totaled $38 for all charges. White and the associated rice farmers filed their petition with the Commission the following month. The Authority later rescinded its structured rate of $38 and announced a flat rate of $30.50 on the main canal for any and all water services and $32.50 for acreage served through the Raywood relift. The rates as then announced were in effect for the crop years of 1970 and 1971.

Rice production is controlled by the United States Government through a system of allotments which are granted to individual farmers and are not fixed to the land. The rice farmer holding an allotment may move the allotment to water sources where favorable rates will improve his margin of profit. Farmers are shown by the record to be moving their allotments from the Devers system to other water sources east and west of Devers where rates are substantially lower. Following the increase of water rates on the Devers system and with announcement of two allotment cuts in the last three years, the number of farmers and the amount of acreage in the system have decreased each year. In 1969 more than 29,000 acres were planted to rice on land watered by the system, but in 1971 the acreage was less than 22,000. Land rents have become depressed, adversely affecting land values in the area.

It was shown at the trial that a small change in water rates makes a significant difference in the rice farmer's net income. The average farm served by the Devers system consists of about 300 acres. Under present water rates, the average farmer, who may have an investment of as much as $150,000 in machinery and equipment, will have a present net income of about $7,500 in a crop year.

The Authority steadfastly asserts that water rates on the Devers system must be set high enough to pay operating expenses, estimated for 1971 at $540,000, and to service the bonded indebtedness, amounting in 1971 to $227,000. With the 1970 rates applied to 1971, the Authority did not realize returns sufficient to pay principal and interest after expenses. With continued reduction in customers and acreage, rates in the Devers system must be increased steadily over the life of the forty-year bonds if expenses of operation are to be met and the bonded debt is to be serviced.

The position of the Authority appears to be that the process of setting rates that will produce revenues adequate to pay expenses and debt service is one of mechanically adding expenses and debt service and dividing by the anticipated acreage for the year. The rate then applied to the customers is arrived at without regard to its being reasonable and just.

Boyt and the other bondholders concede that " . . . there is no effective means of forcing people to buy water, gas or electricity from public agencies or to become or to remain customers of publicly-owned utility systems. In all such cases it is the duty of those having the taxing or rate-making power to levy such taxes or fix such rates as will minimize default and maximize cash flow. Both may reach a pragmatic point of no return."

The Commission qualifiedly accepts this view. Of it the Commission states, "If this is the meaning of the 'mandatory duty' sought to be imposed upon the Commission by Appellants, the Commission has little quarrel with the rule. The Commission, on the other hand, vigorously opposes the imposition of the rigid, inflexible rate standard which is apparently sought by the

TRA [Authority] and submits that such a rule would be unreasonable, improper and self-defeating."

The trial court's order granting temporary relief states: "Although in fixing rates to be charged by the Trinity River Authority of Texas for furnishing irrigation water through the Devers Canal System, it is proper for the Texas Water Rights Commission to consider the cash flow requirements necessary to enable the Trinity River Authority to meet the operation and maintenance expenses and debt-service requirements on its . . . Revenue Bonds . . . along with other factors, the Court is of the opinion that it is not mandatory that the Commission fix rates adequate to produce such cash flow when such a rate would be unreasonable from the standpoint of the customers of the system."

White and the associated rice farmers argue that, "As a matter of simple justice, or perhaps more importantly, economic reality, any revenue financing scheme must be based on a rate structure that deals reasonably and justly with the customer."

The Commission asserts that it " . . . recognizes fully the importance of municipal revenue bond financing to the construction of needed capital improvements by a public agency and the necessity for preserving the integrity of the covenants which support these bonds. In the order under attack, the Commission recognized, contrary to the contentions of the Rice Farmers, the necessity for 'taking into consideration operation and maintenance costs [and] debt service' . . . and it approved for the crop year 1971 the rates adopted by the TRA [Authority]."

■■ To be entitled to the trial court's temporary injunction, it was not necessary

for White and the other rice farmers to assume the burden of proving that they would ultimately prevail. A showing of a probable right and a probable injury was sufficient, and we find that this burden was met. Sun Oil Company v. Whitaker, 424 S.W.2d 216 (Tex.Sup.1968); Ford v. Aetna Insurance Company, 424 S.W.2d 612 (Tex.Sup.1968). It is settled that on appeal the judgment of the trial court must be affirmed on any theory of law applicable to the case regardless of whether the trial court gave a correct reason for the judgment or gave no reason at all. Gulf Land Co. v. Atlantic Refining Co., 134 Tex. 59, 131 S.W.2d 73, 84; Pope v. American National Insurance Co., 443 S. W.2d 377, 381 (Tex.Civ.App. Tyler 1969, writ ref. n. r. e.).

We recognize, as suggested by the Commission, that the basic issue ultimately to be decided in this case is the proper rate standard to be applied, but that " . . . this issue is not ripe for decision on ·this appeal" and that it " . . . should be decided only after full development of the issues on the merits." White and the associated rice farmers also " . . . suggest this contest may be more complicated than just a simple choice between two competing rate theories."

■ We conclude that the cash flow theory urged by appellants is not the only permissible standard for setting rates. Only after facts have been fully developed at a trial on the merits can an affirmative standard for rate setting be determined.

■ The Commission and the trial court had jurisdiction, and temporary relief granted by the trial court was proper.

We affirm the judgment of the trial court.